IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TONYA BALTES, | ) | CASE NO. 4:20-cv-239 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tonya Baltes ("Baltes") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

As set forth more fully below, the ALJ's evaluation of the treating source opinion authored by physical therapist Kovacic and cosigned by Dr. Demario is not supported by substantial evidence. As a result, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

Baltes filed applications for DIB and SSI in September 2016, alleging a disability onset date of May 2016. Tr. 350. She alleged disability based on the following: herniated disc, pinched nerve in neck, osteoarthritis in hip, back and neck, depression, anxiety, Meniere's disease, GERD, and high blood pressure. Tr. 318. After denials by the state agency initially (Tr. 132, 133) and on reconsideration (Tr. 162, 163), Baltes requested an administrative hearing (Tr.

1

197). A hearing was held before an Administrative Law Judge ("ALJ") on August 1, 2019. Tr. 14. In her November 9, 2019, decision, the ALJ determined that Baltes can perform her past relevant work as well as other jobs that exist in significant numbers in the national economy, i.e. she is not disabled. Tr. 89-91. Baltes requested review of the ALJ's decision by the Appeals Council (Tr. 248) and, on December 17, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Baltes was born in 1965 and was 50 years old on her alleged onset date. Tr. 90. She has a high school education and completed a training program and degree in Hamburgerology, wherein she was trained in fast food management. Tr. 21-22.

### B. Relevant Medical Evidence

On April 15, 2015, Baltes saw Dr. Brocker, M.D., and reported having headaches "everyday all day." Tr. 609. They had gotten worse since her last visit with him. Tr. 609. Her pain was frequent; it was throbbing and burning; and she rated it 8/10. Tr. 609. She had spent all day in the emergency room the week before with a headache. Tr. 609. Dr. Brocker prescribed medication. Tr. 611.

On May 21, 2015, Baltes returned to Dr. Brocker. Tr. 520. She was still experiencing daily headaches that felt "like someone is drilling a hole in her head with the pain going from the left side ear up to her head." Tr. 520. The pain was in her occipital area. Tr. 520. Stress made it worse and she was under a lot of stress at that time. Tr. 520. Upon exam, she had a positive Spurling's test at her neck base; bilateral C4, C5 and C6 hypalgesia between her shoulder blades; and increased cervical paraspinal muscle tone. Tr. 521. Dr. Brocker reviewed a recent brain

MRI, which was "nice and normal."  Tr. 521.  He diagnosed migraine headaches, muscle contraction headaches, and cervical radiculopathy.  Tr. 521.  Her medication lists included Maxalt, Imitrex, Topamax, and Norco, and Dr. Brocker added Gabapentin for her "really devastating and bothersome" neck pain.  Tr. 521-522.

On August 13, 2015, Baltes returned to Dr. Brocker, who described her as "really hurting all over, it looks like she has left cervical radiculopathy that is problematic."  Tr. 519.  He increased her medications and started her on a Medrol Pak for inflammation.  Tr. 519.

On September 29, 2015, Baltes went to the emergency room for an acute exacerbation of her chronic headaches and chronic neck pain.  Tr. 514.  She complained of neck and face pain markedly worsening over the left side of her face, the top of her head, and down her left arm, along with numbness and tingling in her left arm.  Tr. 514.  She had just started a new job, which made things worse.  Tr. 514.  A CT scan of her cervical spine showed spondylosis at C5-C7, congenital block vertebra at C2-C3, severe facet arthropathy at left C3-C4, severe degenerative changes of left-sided C1-C2 articulation, and no spinal or foraminal stenosis.  Tr. 514.

Baltes returned to Dr. Brocker on October 15, 2015, for worsening neck pain radiating into her head, left ear, and the left side of her jaw.  Tr. 509.  The pain was constant, 10/10, and she also had numbness and tingling in her hands and feet and weakness in her left arm.  Tr. 509.  Stress, lifting, and turning her head certain ways made her pain worse.  Tr. 510.  She described her pain as "severe she feels disoriented a floating like feeling, hard time putting words together."  Tr. 510.  Dr. Brocker noted that Baltes had not tried physical therapy in the last three months, did not exercise or use a TENS unit, and had taken ibuprofen for the last three months for her condition.  Tr. 510.  Dr. Brocker characterized her cervical CT scan as showing congenital fusion worsening and an EMG as showing motor cervical radiculopathy.  Tr. 511.  He

3

listed her progress as "still suffering" and stated, "she doesn't really have migraines, she has nerve pain." Tr. 511.  He opined that it looked like worsening cervical radiculopathy and increased her Gabapentin and ordered an MRI.  Tr. 511.

An MRI of Baltes' cervical spine taken November 2, 2015 showed multi-level disc herniations from C3-4 down to C6-7.  Tr. 547-548.  Dr. Broker commented that the imaging showed a number of slightly bulging discs, but no core compression or need for surgical intervention.  Tr. 585.

On December 17, 2015, Baltes saw a pain management doctor for an evaluation.  Tr. 578. Upon exam, she had tenderness over her lower cervical spine and left greater occipital area, positive sensory changes at left C5-6, positive Spurling's test, positive facet loading of the cervical spine, significant muscle spasm, trigger point activities, and decreased range of motion in all three planes.  Tr. 582.  She ambulated without assistance.  Tr. 582.  She was advised to continue her low velocity home exercise program and physical therapy and continue her ongoing conservative treatment; steroid injections and nerve blocks in her cervical spine and an occipital nerve block were recommended.  Tr. 582-583.

On January 13, 2016, Baltes returned to pain management.  Tr. 502.  She was awaiting insurance approval of injections and was started on Percocet.  Tr. 504.  On March 7, she stated that her medications took the edge off her pain and helped her maintain her functional status.  Tr. 495.

On March 28, 2016, Baltes visited the emergency room complaining of low back pain radiating into her left groin and buttock.  Tr. 492.  An x-ray of her lumbar spine showed mild degenerative changes greatest at L4-5.  Later that day, she visited pain management and reported 50-60% pain relief after her first round of cervical epidural steroid injections, and the treatment

4

note states that her physical exam showed "dramatic improvement" in the muscle spasms and range of motion. Tr. 491.

In April 2016, Baltes underwent two left occipital nerve blocks and reported 90% headache relief for 4 days and then 60% relief one week later. Tr. 485-87.

On May 3, 2016, Baltes visited pain management. Upon exam. she had tenderness over her upper left cervical spine, tenderness over her trapezial muscles, reduced range of motion of her cervical spine, a normal neurological examination of her arms, a normal motor and sensory examination, a normal gait and reflexes, and normal strength bilaterally in all extremities. Tr. 483. She reported that a left cervical facet injection that she had had the day before provided no pain relief and caused nausea; she did not want another facet injection. Tr. 483.

On July 6, 2016, Baltes underwent radio frequency ablation of her left occipital nerve. Tr. 470. She was discharged with "excellent results and no complication." Tr. 475. On July 27, she reported fewer severe headaches but increased pain in her neck, shoulders, and left hip. Tr. 468. Upon exam, she had tenderness over her lower cervical spine and trapezial muscles and reduced and painful cervical range of motion. Tr. 469. She had paraspinal tenderness over her lumbar and left hip areas, left sacroiliac tenderness, and a limited range of motion with pain. Tr. 469. She had a normal gait, reflexes, sensation, and motor exam. Tr. 469. In August she had a positive straight leg raise test on the left and reduced strength in her left lower extremity. Tr. 573. She had a full, pain free range of motion in her cervical spine. Tr. 573. An x-ray of her left hip showed no fracture or dislocation. Tr. 639.

On September 10, 2016, Baltes visited the emergency room complaining of worsening low back pain radiating to her left leg. Tr. 462. Upon exam, she had a decreased range of motion, tenderness, pain and spasm in her lumbar back, and tenderness and edema in her left leg.

5

Tr. 463. She was prescribed Flexeril for muscle spasms and Toradol for pain. Tr. 463. On September 14, she saw her primary care physician Dr. Demario, M.D., and reported worsening neck pain, uncontrollable twitching, and bilateral arm pain. Tr. 612. Dr. Demario prescribed Hydrocodone for pain. Tr. 614.

During a psychological evaluation on December 13, 2016, Dr. Haaga, M.D., observed that Baltes "would turn her body rather than her head and had difficulties standing after the interview." Tr. 650, 653.

On January 5, 2017, Baltes saw Dr. Ugokwe, M.D., for a neurosurgical evaluation. Tr. 661. She described her neck pain as constant, gradually worsening, and rated 7/10. Tr. 661. She reported that positioning aggravated her pain and it worsened during the day. Tr. 661. Treatment had provided mild relief. Tr. 661. Dr. Ugokwe recommended C3-C4 through C5-C6 anterior cervical discectomy and fusion. Tr. 662. Baltes saw orthopedic surgeon Dr. Savage, M.D., on January 30, and he did not recommend surgery; he prescribed physical therapy. Tr. 682, 685.

On January 31, 2017, Baltes presented for a physical therapy initial examination. Tr. 823. She complained of chronic cervical pain, daily headaches, and left hip and lumbosacral pain that increased with ambulation. Tr. 823. Upon exam, she had a limited range of motion in her cervical spine, shoulder flexion and abduction, bilaterally, and left hip flexion and abduction. Tr. 823-824. She had a positive cervical closed pack test and a negative cervical compression test; positive straight leg raise on the left, and a positive lumbar spring test. Tr. 824. Physical therapy was recommended to increase her cervical range of motion and upper and lower extremity strength. Tr. 824. She requested to be discharged in April after 11 sessions due to limited progress. Tr. 766.

6

On February 23, 2017, Baltes saw Dr. Khalaf for further evaluation of her neck pain. Tr. 988. She reported left-sided occipital pain that radiated to her jaw line, intermittent left arm pain to her elbow and tingling in her hand and third and fourth fingers, and headaches. Tr. 988. She rated her neck pain as 6/10 on that day and 10/10 at its worst. Tr. 988-989. Lifting, neck rotation, and lying supine aggravated her neck pain and heat relieved it. Tr. 989. Upon exam, she had a limited range of motion in her cervical spine, especially rotation with pain reproduction, 4 to 4+/5 strength in her upper and lower extremities bilaterally, and she reported that she could not abduct her shoulders more than 90 degrees due to pain. Tr. 991. Dr. Khalaf assessed chronic headaches, cervical spondylosis without myelopathy, and chronic pain; she agreed with the neurology consultant that Baltes' main complaint was headaches, which appeared to have a migraine component. Tr. 991.

On March 2, 2017, Baltes saw headache specialist Dr. Estemalik, M.D. Tr. 1220. She described her headaches as located in the occipital area, mostly on the left side, with radiation to her jaw line. Tr. 1220. She had had headaches and neck pain for 15 years, daily pain for the past 2 years, and was never pain free. Tr. 1220. Any mechanical movement worsened her pain. Tr. 1221. Her exam was normal. Tr. 1222. Dr. Estemalik recommended a three-week intensive chronic pain rehabilitation program. Tr. 1222.

On March 23, 2017, Baltes saw Dr. Demario complaining of low back and left hip pain. Tr. 739. On April 10, an MRI of her left hip revealed partial tearing/tendinosis of her gluteal tendons. Tr. 757.

On May 22, 2017, Baltes received a Kenalog injection in her left hip. Tr. 810. On May 26, she reported that her hip was feeling better and that she could "definitely walk better." Tr. 667. She reported still having some buttock pain. Tr. 667.

7

On July 10, 2017, Baltes saw an orthopedic physician, Dr. Salata, M.D., for an evaluation of her left hip pain. Tr. 710.  Upon exam, she had normal strength, intact sensation, positive impingement signs, and a negative instability test.  Tr. 710.  Dr. Salata stated there was a labral tear seen on the MRI and diagnosed femoroacetabular impingement of the left hip.  Tr. 711.  Surgery was recommended, and in August Baltes had left hip arthroscopy, acetabular labral repair and debridement, femoral osteochondroplasty, capsular plication, and trochanteric bursectomy.  Tr. 704.  At a follow up with Dr. Salata in November, she reported significant improvement and was doing very well.

In early 2018, Baltes saw Dr. Demario monthly for follow up visits.  Tr. 777, 775, 778.  She variously reported arthralgia/joint pain and back pain, Tr. 774, and frequent or severe headaches, Tr. 777, 780.  Dr. Demario described her as "chronically ill" and found pain with range of motion of her neck and low back tenderness, Tr. 774, 780, and, in May, left trapezius muscle spasms, Tr. 1092.  He adjusted her medications.

On May 4, 2018, Baltes followed up with Dr. Estemalik for her headaches.  Tr. 1218.  Baltes had not committed to Dr. Estamalik's prior recommendation to participate in a chronic pain rehabilitation program.  Tr. 1218.  Upon exam, she had left sub-occipital tenderness.  Tr. 1219.  Dr. Estemalik determined that she met the FDA criteria for chronic migraine headache and that Botox injections were the only FDA approved treatment.  Tr. 1219.  Thereafter, he administered Botox injections.  Tr. 1150.

On August 28, 2018, Baltes called Dr. Estemalik's office and reported that she was in the hospital for a GI problem; she was experiencing a bad flare up of headache pain which she believed was due to not taking her usual vitamin regimen since she had been hospitalized.  Tr. 1216.  She received a migraine cocktail at the hospital, which had helped, but now her pain had

8

increased again. Tr. 1216. She asked what could be prescribed to break the cycle and was advised she had to make an appointment. Tr. 1216-1217.

### C. Opinion Evidence

On May 11, 2017, physical therapist Ms. Kovacic, P.T., completed a functional capacity evaluation, which Dr. Demario also signed. Tr. 688-92. During the FCE, Baltes stood for 14 minutes, sat for 12 minutes, and walked 0.1 mile. She was able to lift 5 pounds and was deemed to be able to occasionally carry 5 pounds and frequently carry 3 pounds. She could not crouch. She could reach in all directions with both arms, climb a flight of stairs, stoop, kneel, and crawl on hands and knees (but not hands and feet). She could seize an object with her right hand but not her left hand, pick up a small object using all the fingers of both hands, and had an acceptable tip pinching capacity with both hands but an unacceptable key pinching capacity and Palmer grip with her left hand. She was unable to turn an object with her left hand. Kovacic opined that Baltes could perform sedentary work with the following restrictions: occasionally lift and carry five pounds and frequently carry three pounds; stand for up to 14 minutes at a time, sit for 12 minutes at a time, and walk one-tenth of a mile; push 40 pounds and pull 50 pounds; and could not seize, key-pinch or Palmer-pinch, or turn objects with her left hand. She commented that Baltes had difficulty due to weakness in her left upper extremity and that decreased coordination in her left upper extremity had been noted. Kovacic stated that Baltes' left hip also caused pain, with awkward attempts at some testing.

On April 26, 2018, Dr. Demario completed a treating source statement on behalf of Baltes. Tr. 1039-1042. He stated that he had treated her since October 2013. Tr. 1039. He listed the following diagnoses that he had treated her for: cervical radiculopathy, cervico-occipital neuralgia, chronic neck pain, low back pain, depression, PTSD, hip pain, insomnia,

Meniere's disease, mixed hyperlipidemia, tension headaches, and chronic nerve pain left side of head. He opined that Baltes would be off-task more than 25 percent of the time; could pay attention between five and fifteen minutes before needing a break; and absent more than four days per month. She could rarely lift and carry less than 10 pounds; sit, stand, or walk for one hour; would need to lie down for 10-15 minutes per hour; could never reach overhead with the left upper extremity; could frequently climb ramps, and stairs; occasionally balance, stoop, climb ladders, ropes or scaffolds, and crawl; and rarely kneel or crouch. She could never rotate her head or neck or be at unprotected heights, could rarely be around moving mechanical parts and be exposed to extreme cold, could occasionally operate a motor vehicle, and could frequently be exposed to extreme heat.

### D. Testimonial Evidence

#### 1. Baltes' Testimony

Baltes was represented by counsel and testified at the administrative hearing. She lives alone and has a driver's license. Tr. 21. She drives locally, but "if it's any distance" her daughter or a friend drives her. Tr. 21. Her father drove her to the hearing. Tr. 21.

Baltes testified that the main reason she is unable to work is her occipital neuralgia, the nerve pain in her head. Tr. 34. She has experienced head pain every day since Christmas 2014. Tr. 34. She has very little mobility in her head and neck. Tr. 35. For instance, she cannot bend over or vacuum. Tr. 35. She also experiences nausea. Tr. 35. Some days she just goes from her bed to her recliner. Tr. 35. She also has flare ups, where her pain goes to 12 to 14 out of 10. Tr. 35. Her pain goes into her face, the left side of her jaw, and behind her eye. Tr. 35. It affects the vision in her left eye and her hearing. Tr. 35. When she first started getting flare ups in 2015, they lasted 3 days; she recently had one that lasted 14 days. Tr. 35. Those days she stays

10

in her recliner with her rice pack, water bottle and heating pad.  Tr. 36.  She can't read her bible on those days as she normally would.  Tr. 36.  She tells her friends who text her that she is having a flare up and watches Netflix to try to take her mind off her pain.  Tr. 36.

Baltes listed the medications she takes for this issue; they help on a daily basis but do not help her when she is having a bad flare up.  Tr. 37.  About five weeks ago she stared getting Botox injections, which she will get every 12 weeks and which are a last resort, as there is nothing else that can be done.  Tr. 37.  It takes three courses of injections, or about six months, before one can expect to tell whether they help or not.  Tr. 38.  Her doctor also said that if she is having a bad flare up she can call and go in for an IV treatment, so that is also an option for her.  Tr. 38-39.  She used to go to the emergency room for her headaches in the past but she has not gone in over a year and a half, since she started treating at the Cleveland Clinic.  Tr. 39.

When asked if her medications cause side effects, Baltes stated that they do.  Tr. 40.  Her gabapentin causes brain fog, where she cannot remember a word she wants to say.  Tr. 40.  Loud noises, such as her dog barking, make her head pain worse.  Tr. 41.  Not being able to support her neck, as when standing and sitting, also makes it worse, as does extreme cold.  Tr. 41.

Baltes also has problems with her left hip.  Tr. 42.  She had surgery a year ago and "everything turned out great."  Tr. 42-43.  But she still has pain in her hip when she walks; she can't sit, stand, or walk too long.  Tr. 43.  She can sit for about 20 minutes and stand for about 20-30 minutes.  Tr. 43.  Standing also helps her neck if she's not otherwise able to support it.  Tr. 43.  Her occipital neuralgia also affects her ability to use her arm.  Tr. 44.  This problem is partially due to the fact that she gave herself whiplash about 18 years ago when she walked into an open cabinet.  Tr. 44.  The pain goes down her left arm and into her fingers.  Tr. 44-45.  She also gets neuropathy in her fingers, the roof of her mouth, and her tongue.  Tr. 45.  Her left arm

11

is weak and she can't open or carry things with it. Tr. 45. She experiences depression as well; she has tried to simplify things by getting all her medications from Dr. Demario, her primary care physician whom she sees once a month, rather than seeing multiple doctors. Tr. 46.

Regarding her activities, Baltes stated that she tries to attend church on Sundays when she can; her church is "literally in my backyard." Tr. 46. She also tries to attend bible study one night a week; she tries to push herself to do those kinds of things. Tr. 46. Her daughter no longer lives with her because Baltes was physically and financially unable to care for her; her daughter now lives in Florida with her dad. Tr. 48-49. She is capable of taking care of her personal hygiene but she doesn't always do it; there are times when she doesn't change her clothes for days or shower. Tr. 49-50. She puts dishes in the dishwasher and she can go downstairs to do loads of laundry if she divides it into smaller baskets to carry so it's not as heavy. Tr. 50. She is able to cook but rarely does so; when she does, she cooks a lot of food at once and then puts it in the refrigerator so she can just warm it up later. Tr. 50-51. She goes grocery shopping when she feels like it, although there are times she can't and her father or a friend will go for her. Tr. 51. When she goes she uses the grocery cart to lean on. Tr. 51. She has a dog she cares for. Tr. 51. When asked if they go for walks, Baltes replied that they both should, but they haven't lately. Tr. 51. The last time she took her dog for a walk was "last fall." Tr. 51. She does not go out with friends because she has no money. Tr. 52. A friend down the street has a swimming pool and Baltes went over during the summer to float on a raft in her pool. Tr. 52. Once she felt good so she swam and exercised in the pool and was "down" for two days afterwards. Tr. 52.

On a typical day, Baltes wakes up and takes her medication. Tr. 53. Then she will lie back down in her bed for a short time before she gets up again and makes a cup of coffee. Tr.

12

53. She will sit in her recliner with her heated-up rice pack or her ice cap on her head. Tr. 53. She reads her bible for a little bit and then watches television for a few hours. Tr. 53. Then she will get up, feed the dog, replace the ice in her ice pack, and watch more television. Tr. 53. The day before the hearing she had to do laundry, but she was nauseous so she did not get up to do laundry until about 4:00 in the afternoon. Tr. 54. She had to go to the bank, so her friend came over and drove her. Tr. 54. They stopped at the drug store so she could pick up her medication list. Tr. 54. They returned home and watched a television show. Tr. 54. Later that night Baltes took a bath so she could wash her hair in preparation for the hearing. Tr. 54. Then she went to bed with her icepack, took her medication, and watched television until she fell asleep. Tr. 54.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. The ALJ discussed Baltes' past work history as a fast food worker, fast food manager and district manager, and machine engraver. Tr. 56. The ALJ asked the VE to determine whether a hypothetical individual of Baltes' age, education and work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below, and the VE answered that such an individual could perform Baltes' past work of machine engraver and that she could also perform the following additional jobs with significant numbers in the national economy: housekeeper, office helper, and sales attendant. Tr. 57-58.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her November 9, 2018, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021. Tr. 79.

2. The claimant has not engaged in substantial gainful activity since May 17, 2016, the alleged onset date. Tr. 79.

3. The claimant has the following severe impairments: Degenerative disc disease of the cervical spine with spondylosis, a congenital block vertebra, cervical radiculopathy and occipital neuralgia (hereinafter, collectively, the "cervical impairment"), degenerative disc disease of the lumbar spine with disc space narrowing, migraine headaches, trochanteric bursitis/acetabular labral tear of the left hip, status-post arthroscopy and bursectomy (hereinafter, collectively, the "left hip impairment"), ischemic peripheral neuropathy, an affective disorder (diagnosed variously as major depressive disorder and persistent depressive disorder), other specified anxiety disorder, and other specified trauma and stressor-related disorder. Tr. 79.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 79.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may occasionally reach overhead with the bilateral upper extremities; the claimant may frequently climb ramps and stairs and may occasionally balance, stoop, kneel, crouch, crawl, climb ladders, ropes, or scaffolds; the claimant must avoid concentrated exposure to extreme cold and may not be exposed to more than moderate noise levels; the claimant must avoid all exposure to workplace hazards, including unprotected heights and moving mechanical parts; the claimant is limited to the performance of detailed, but not complex tasks (meaning that she is able to perform semi-skilled work), undertaken in a setting free of production rate pace (as is found in assembly line work), which setting allows for advance explanation, and gradual implementation, of any changes to workplace tasks or duties. Tr. 81-82.

6. The claimant is capable of performing past relevant work as a machine engraver, having a sedentary exertional level designation and a specific vocational preparation factor of

15

    three. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 89.

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 17, 2016, through the date of this decision. Tr. 91.

## V. Plaintiff's Arguments

Baltes argues that the ALJ erred when evaluating the opinion evidence and her statements concerning her limitations. Doc. 15, pp. 12-13.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Baltes argues that the ALJ did not give "good reasons" when she rejected Dr. Demario's opinions. Doc. 15, pp. 13-17. The Court agrees that the ALJ's decision with respect to Dr. Demario's first opinion is not supported by substantial evidence.

    Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

16

case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered both of Dr. Demario's opinions to be treating physician opinions: (1) the May 11, 2017, FCE completed by physical therapist Ms. Kovacic and co-signed by Dr. Demario and (2) the April 26, 2018, medical source statement completed by Dr. Demario. Tr. 87-88. The ALJ assigned both opinions "marginal" weight. The ALJ noted that Dr. Demario is Baltes' primary care physician who had treated her for a lengthy period, and stated,

> As to his first opinion, it is noted that the testing administered had no objective controls for reliability of effort. His treatment notes generally describe some form of tenderness or pain, but do not indicate atrophy, failure of strength, sensory dysfunction or neurological impairment, such that these opinions are not consistent with his own treatment notes. His notes are quite consistent across the period relevant to these opinions, yet inexplicitly, the second opinion suggest some minor improvement in function in some categories, and some new limitations not appearing on the functional capacity evaluation, for example, overhead reaching and manipulation with the left upper extremity. His treatment record shows the claimant to appear as and when appointed, and that she is awake, alert, and able to participate in her own treatment, such that there appears no objective basis for his opinion of "off-task" behavior, absenteeism, or the need to lie down for fifteen minutes for each hour. Neither of his opinions are consistent with his own treatment records, such that neither of these opinions are eligible to be considered for the assignment of controlling weight. Otherwise, and in the very broad sense that the overall evidence of record, described in digest form in the preceding paragraph, supports exertional, postural, manipulative and environmental limitations, these opinions are marginally consistent with, and supported by, the evidence of record, in consequence of which, they are afforded marginal weight.

17

Tr. 87-88. (citations to the record omitted).

Regarding the first opinion, Baltes argues that the ALJ's statement that the FCE had no objective controls for reliability of effort is speculative and inaccurate and, therefore, is not supported by substantial evidence. Doc. 15, p. 17. The Court agrees that the ALJ's statement is ambiguous and does not constitute substantial evidence. It is unclear if the ALJ faulted the form used,[2] the way the testing was done, or the comments (or lack thereof) provided by physical therapist Kovacic and signed off on by Dr. Demario. There does not appear to be anything written by Kovacic that would lead one to suspect Baltes did not put forth full effort. If anything, Kovacic's additional written comments at the end of the form indicate that Baltes did put forth full effort, as Kovacic stated that she observed weakness and lack of coordination in Baltes' left arm and awkward attempts at some testing due to hip pain. Tr. 692. Indeed, the FCE was performed a few months prior to the discovery of a labral tear in Baltes' left hip, which required surgery.

The other reason the ALJ cited for giving "marginal" weight to the FCE was that the opinions in the FCE were not consistent with Dr. Demario's own treatment notes. The ALJ explained that Dr. Demario's notes showed tenderness or pain, "but do not indicate atrophy, failure of strength, sensory dysfunction or neurological impairment." However, Dr. Demario's treatment notes cited by the ALJ did not include neurological exams. Nor did he assess strength or sensation. Thus, it cannot be said that Dr. Demario's notes are *inconsistent* with the findings in the FCE. In short, neither of the ALJ's two reasons for rejecting the May 11, 2017, FCE is supported by substantial evidence. The ALJ's decision, therefore, must be reversed. *Rogers v.*

---

[2] The form is titled "Dictionary of Occupational Titles Residual Functional Capacity (DOT-FCE) Battery" and describes the basis for the testing. Tr. 688.

18

*Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (ALJ's reasons for discounting treating physician opinion evidence was not supported by substantial evidence, requiring remand).

Furthermore, regarding Dr. Demario's second opinion, the ALJ noted that it indicated "new limitations," including overhead reaching and manipulation with the left upper extremity.  Doc. 15, p. 19; Tr. 87.  However, as Baltes points out, Dr. Demario's second opinion did not include a left upper extremity manipulation limitation.  Therefore, the ALJ's characterization of that portion of the opinion is inaccurate.  On remand, the ALJ will have an opportunity to reevaluate Dr. Demario's second opinion as well.

Baltes also challenges the ALJ's assessment of her statements regarding her symptoms.  Doc. 15, p. 20.  She submits that the ALJ's finding that her allegations of chronic headaches were not supported by the record because she "follows only a regimen of narcotic pain relievers" and "has never discernably been prescribed any of the typical 'triptan' drugs associated with headaches" is incorrect.  Baltes identifies treatment notes in the record that indicate she was taking two "triptan" medications in 2015.  Doc. 15, p. 23 (citing Tr. 521; 610).  Because remand is warranted due to the ALJ's decision regarding Dr. Demario's opinions, the ALJ will have an opportunity to reassess Baltes' statements regarding her symptoms.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision **REVERSED and REMANDED** for proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: December 21, 2020

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge